UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BORMAN, LLC, a Missouri limited
liability company,

        Plaintiff,

v.                                 Case Number: 12-15567
                                 Honorable Victoria A. Roberts

18718 BORMAN, LLC, a Michigan limited
liability company, and JOSEPH SCHWEBEL,

        Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. # 29); DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DOC. # 35); and DISMISSING PLAINTIFF'S CLAIMS**

## I.   INTRODUCTION

In October 2010, defendant 18718 Borman, LLC ("Borrower") defaulted on a

commercial mortgage loan secured by a mortgage on real property.  After a foreclosure

sale, Plaintiff Borman, LLC ("Plaintiff") acquired the rights of the original lender and

brought this action to recover the deficiency between the balance owed on the loan and

the amount recovered at foreclosure – an amount exceeding $6,000,000.  Plaintiff

claims that the loan documents allow it to recover the deficiency from Borrower and the

guarantor of the loan, defendant Joseph Schwebel ("Guarantor"; together

"Defendants").

Before the Court are: (1) Defendants' Motion to Dismiss and/or For Summary

Judgment (Doc. # 29) and (2) Plaintiff's Motion for Summary Judgment (Doc. # 35).

Defendants say the Court should dismiss the action because: (1) the

Nonrecourse Mortgage Loan Act, MCL 445.1581, *et seq.* (the "NMLA" or "Act") – a law

passed by the Michigan Legislature and signed into law in March 2012 – bars Plaintiff's claims; or (2) even without the NMLA, they are not personally liable under the loan as a matter of contract interpretation.

In support of its affirmative summary judgment motion, Plaintiff argues that: (1) the NMLA does not apply to the loan; and (2) even if applicable, the Act does not bar its claims because it unconstitutionally applies retroactively to destroy its vested contractual rights; specifically, Plaintiff says the NMLA violates: (i) the Contract Clause; (ii) its due process rights; and (iii) separation of powers.

Also before the Court is nonparty Michigan Attorney General's amicus brief in support of the constitutionality of the NMLA (Doc. 46), to which Plaintiff responded. Both motions are fully briefed; the Court heard oral argument on March 10, 2014.

Defendants' Motion to Dismiss and/or For Summary Judgment (Doc. # 29) is **GRANTED**; Plaintiff's Motion for Summary Judgment (Doc. # 35) is **DENIED**.  Plaintiff's claims are **DISMISSED**.

No genuine issue of material fact exists; Defendants are entitled to judgment as a matter of law.  The Loan is a nonrecourse loan and the SPE provisions Plaintiff relies on are post closing solvency covenants within the meaning of the Nonrecourse Mortgage Loan Act; the NMLA applies to the Loan Documents and bars Plaintiff's claims.  The NMLA does not violate the Constitution of the United States or Michigan.

## II.   BACKGROUND

### A.   Commercial Mortgage-Backed Securities Financing

The loan at issue is a type of securitized loan known as a Commercial Mortgage-

Backed Securities ("CMBS") loan.  The CMBS loan structure is, for the most part, standard nationwide.  CMBS loans are packaged with other commercial loans and sold as part of a securitized pool of mortgages; they are underwritten, marketed, sold, and documented under standardized loan documents as "nonrecourse" loans, which means that the borrower is not personally liable except in limited circumstances.

In CMBS financing, a lender's typical recourse for a borrower's default is foreclosing on the property which secures the loan.  In return for the lender agreeing not to pursue recourse liability directly or indirectly against the borrower or its owners, the borrower promises that the financed asset and its cash flows are isolated from other creditors and liens.  The borrower makes specific covenants to the lender promising to maintain a single purpose entity ("SPE") status; the purpose of maintaining a SPE status is to minimize the possibility of a borrower declaring bankruptcy, which could drag the entire securitized mortgage pool into bankruptcy.  If the borrower fails to abide by the covenants – by engaging in certain "bad boy acts" and/or failing to maintain SPE status – the loan can become fully recourse against its borrower and/or guarantors.

The following excerpt from a Michigan Court of Appeals' case summarizes the characteristics of CMBS financing:

> One of the bedrock elements of a CMBS financing is the isolation of the asset to be financed. This is the essential bargain between borrower and lender that permits financing on a non-recourse basis: the lender agrees not to pursue recourse liability directly or indirectly against the borrower or its owners, provided that the lender can comfortably rely on the assurance that the financed asset will be "ring-fenced" from all other endeavors, creditors and liens related to the parent of the property owner or affiliates, and from the performance of any asset owned by such parent entity or affiliates. More specifically, it is not just the isolation of the real property asset, but the isolation of the cash flows coming from the operation of the real property, from which debt service is paid on the

3

mortgage loan and subsequently distributed to the holders of the securities issued backed by such mortgages....

The twin components of asset isolation are (i) separateness covenants (the " Separateness Covenants") and (ii) narrow limitations on the lender's general agreement not to pursue recourse liability (the " Limited Recourse Provisions")....

The Separateness Covenants, while often referred to and discussed as a unitary concept, are really a package of separate and independent covenants made by a borrower to a CMBS lender. The following is a sample set of Separateness Covenants, taken from the form documents for a CMBS lender:

The borrower has not and, for so long as the mortgage loan shall remain outstanding, shall not:

* * *

(xviii) fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds....

* * *

The Limited Recourse Provisions are the other key element of asset isolation in CMBS financing. It is important to note that the nature and purpose of this limited recourse is different from a financing that relies on recourse to the borrower, its parent or sponsor for additional credit enhancement beyond the security offered by the mortgaged property. In a CMBS financing, in the event of certain "bad acts" (the "Recourse Triggers") on the part of the borrower and/or its affiliates, the lender's basic agreement not to pursue recourse liability against a borrower or its owners or principals has limited application, allowing the lender to pursue recourse as part of its remedies….

*Wells Fargo Bank, N.A. v. Cherryland Mall Ltd. P'ship*, 295 Mich. App. 99, 103-04

(2011) ("*Cherryland I*") (citation omitted).

### B.    Loan History

In June 2005, Borrower obtained an $8,700,000 commercial loan (the "Loan")

from Plaintiff's predecessor-in-interest, Morgan Stanley Mortgage Capital, Inc.

4

("Lender").  Borrower used the Loan proceeds to purchase commercial property located at 18718 Borman in Detroit, Michigan (the "Property").  To memorialize the Loan, Borrower mortgaged the Property in favor of Lender (the "Mortgage") and executed a Promissory Note for the principal sum of $8.7 million (the "Note"); Guarantor – Borrower's sole member – executed a Guaranty of Recourse Obligations of Borrower (the "Guaranty"), in which he promised to repay all obligations of Borrower for which Borrower was personally liable under the Loan.  The specific terms of the Mortgage, Note, and Guaranty (the "Loan Documents") are discussed in section II., C., *infra.*  As additional security, Lender held various reserve and escrow deposits, as well as a $500,000 letter of credit from Guarantor.

As planned, the Loan was securitized and became part of the Morgan Stanley Commercial Pass-Through Certificates, Series 2006-HQ10 (the "Trust").  Lender transferred and assigned all of its rights, title and interest in the Loan Documents to the Trust in late 2006.

At the time of the Loan, the Property was leased in its entirety on a long-term basis to Borman's, Inc. ("Tenant"); it was used as a distribution center for Farmer Jack grocery stores.  In December 2010, Tenant filed for bankruptcy protection and was allowed to terminate the lease; Tenant last paid rent in May 2010.

Once Tenant broke the lease, Borrower – a SPE with no assets other than the Property – had no income; due to the recession, the market value of the Property plummeted, and Borrower could not find a replacement tenant.  Guarantor personally contributed approximately $200,000 to cover utilities, insurance and other property maintenance costs, as well as $64,000 to pay the June 2010 Loan payment.  Shortly

5

thereafter, however, Borrower stopped making Loan payments; Borrower received a formal notice of default in October 2010.

In January 2011, due to Borrower's default, the Trust transferred and assigned all of its rights, title and interest in the Loan Documents to MSCI 2006-HQ10 Borman Avenue LLC through its special servicer, LNR Partners ("LNR"); additionally, Borrower turned the Property over to a receiver for management.  In November 2011, LNR foreclosed on the Property through advertisement; a foreclosure sale was held on December 29, 2011.  LNR successfully bid $2.1 million and received the Sheriff's Deed of Sale.

In addition to taking back the Property at foreclosure, Lender – or one of its successors-in-interest – received the various reserve and escrow deposits, as well as Guarantor's letter of credit; that sum amounted to $1,768,616 from the escrow reserve accounts and $500,000 from the letter of credit.  Neither Lender nor LNR sought a deficiency judgment against Defendants.

In 2012, LNR marketed the Property for sale through Auction.com, an on-line bidding auction website; the marketing materials for the auction listed the Loan as "Non-Recourse."  Commercial Development Company ("CDC"), a company affiliated with Plaintiff, acquired the Property with the high bid of $756,000; LNR transferred and assigned to CDC all of its rights, title and interest in the Loan Documents, foreclosure judgment and Sheriff's Deed.  In May 2012, CDC transferred and assigned all of those rights to Plaintiff.  Plaintiff stands in the shoes of Lender.

### C.   This Action & Relevant Provisions of the Loan Documents

Plaintiff filed this action on December 19, 2012, seeking the deficiency between

6

the outstanding balance of the Loan and the foreclosure sale price.  Plaintiff says

Borrower failed to maintain a SPE status, in violation of specific covenants in the Loan

Documents, by becoming insolvent, failing to make Loan payments, and failing to

maintain adequate capital.  On that basis, Plaintiff says the Loan became fully recourse

to Borrower, and Defendants are personally liable for the deficiency.

Whether Plaintiff can recover the deficiency from Defendants hinges on Article 11

of the Note, which incorporates Section 4.2 of the Mortgage; Article 11 of the Note –

entitled "EXCULPATION" – provides that the Loan is nonrecourse against Borrower,

with limited exceptions; specifically, it says:

> (a)     Notwithstanding anything to the contrary contained in
> this Note, the [Mortgage] or any Other Security Document
> (but subject to the provisions of subsections (b), (c) and (d)
> of this Article 11), Lender shall not enforce the liability and
> obligation of Borrower to perform and observe the
> obligations contained in this Note or the [Mortgage] by any
> action or proceeding wherein a money judgment or any
> deficiency judgment or other judgment establishing any
> personal liability shall be sought against Borrower....
> Lender, by accepting this Note and the [Mortgage], agrees
> that it shall not, except as otherwise provided in this Article
> 11, sue for, seek or demand any deficiency judgment against
> Borrower ... under or in connection with this Note....

(Note, Art. 11(a)).  Like other CMBS loan documents, the Note contains certain carve-

outs from the nonrecourse nature of the Loan.  For example, the Note provides:

> (c)     Notwithstanding the foregoing, the agreement of
> Lender not to pursue recourse liability as set forth in
> subsection (a) above SHALL BECOME NULL AND VOID
> and shall be of no further force and effect and the Debt shall
> be fully recourse to Borrower in the event that: ... (ii)
> Borrower ... fails to comply with any provision of Section 4.2
> of the [Mortgage]....

(Note, Art. 11(c)) (emphasis in original).  Thus, Article 11(c) of the Note contains a

7

springing recourse obligation requiring Borrower to abide by certain covenants in the Mortgage; upon occurrence of any event listed in Article 11(c), the Loan becomes fully recourse.

Under Section 4.2 of the Mortgage – entitled "Single-Purpose Entity" – Borrower agreed, among other things, that it "has not and shall not:

* * *

(j)      become insolvent or fail to pay its debts and liabilities from its assets as the same shall become due; [or]

* * *

(s)      fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of it contemplated business operations."

(Mortgage, §§ 4.2(j), (s)).  Article 11(c) of the Note and Section 4.2 of the Mortgage are the provisions of the Loan Documents on which Plaintiff bases this deficiency action against Borrower.

In the Guaranty, Guarantor "absolutely and unconditionally guarantee[d] to Lender the prompt and unconditional payment of [all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 11 of the Note]."  (Guaranty, ¶¶ 1, 4).  It is undisputed that the Guarantor is personally liable for the same obligations that Borrower is personally liable for under the Loan; thus, if Borrower is liable for the deficiency, so is Guarantor.

### D.      CMBS Financing in Michigan & the Nonrecourse Mortgage Loan Act

In 2012 the Michigan Legislature passed the Nonrecourse Mortgage Loan Act, MCL 445.1581, *et seq.* (the "NMLA" or "Act"); the NMLA invalidates and makes unenforceable any provision in nonrecourse loans rendering a borrower or guarantor

8

personally liable based on the borrower's insolvency or inability to pay its debts and liabilities.  Although there is no binding authority regarding the provisions of the Loan Documents at issue in light of the NMLA, the parties rely almost exclusively on two Michigan Court of Appeals decisions and a decision from this Court, as persuasive authority.  *See Wells Fargo Bank, N.A. v. Cherryland Mall Ltd. P'ship* (on remand), 300 Mich. App. 361 (2013) ("*Cherryland II*"); *Cherryland I*, 295 Mich. App. 99; *51382 Gratiot Ave. Holdings, LLC v. Chesterfield Dev. Co.*, 835 F. Supp. 2d 384 (E.D. Mich. 2011) (Cleland, J.).  *Cherryland I* and *Chesterfield* were decided before the NMLA was enacted; *Cherryland II* was decided after.

> ### 1.    The *Cherryland I* Decision

Plaintiff bases this action on the *Cherryland I* decision.

In December 2011, the Michigan Court of Appeals decided *Cherryland I* – a mortgage deficiency case factually similar to this action (i.e., default on a CMBS loan containing similar SPE covenants).  In *Cherryland* , the property securing the loan was foreclosed upon in August 2010; plaintiff – the high bidder at the foreclosure sale – filed a deficiency action against the borrower and guarantor, claiming that borrower's insolvency violated a SPE covenant in the loan rendering the loan fully recourse. *Cherryland I*, 295 Mich. App. at 105-06.  The SPE covenant plaintiff relied on was nearly identical to the one here; it required borrower to "remain solvent and ... pay its debts and liabilities ... from its assets as the same shall become due."  *Id.* at 112-13.  The trial court found for plaintiff; it held that borrower's insolvency violated the SPE covenant and triggered recourse liability against defendants.  *Id.* at 107.

On appeal, the defendants argued, among other things, that the trial court erred in finding that borrower's insolvency rendered the loan fully recourse against the guarantor. *Id.* at 110. Despite finding that "no cases have held that insolvency is a violation of SPE status," the Michigan Court of Appeals found that the controlling loan documents "unambiguously required [borrower] to remain solvent in order to maintain its SPE status"; and, it held that borrower's failure to do so "result[ed] in the loan becoming fully recourse." *Id.* at 120, 128. In finding that borrower's insolvency triggered the full recourse provision of the mortgage, the court noted that:

> We recognize that our interpretation seems incongruent with the perceived nature of a nonrecourse debt and are cognizant of the amici curiae's arguments and calculations that, if accurate, indicate economic disaster for the business community in Michigan if this Court upholds the trial court's interpretation. Nevertheless, the documents at issue appear to be fairly standardized nationwide, and defendants elected to take that risk—as did many other businesses in Michigan and nationwide. It is not the job of this Court to save litigants from their bad bargains or their failure to read and understand the terms of a contract....

*Cherryland I*, 295 Mich. App. at 126.

The *Cherryland* defendants argued that, even if the loan documents provided that the loan became fully recourse upon borrower's insolvency, the court should avoid enforcing the provision because it was against public policy. *Id.* at 127. The court dismissed this argument:

> As a general rule, making social policy is a job for the Legislature, not the courts. *See In re Kurzyniec Estate,* 207 Mich.App. 531, 543, 526 N.W.2d 191 (1994). This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's. *O'Donnell v. State Farm Mut. Automobile Ins. Co.,* 404 Mich. 524, 542, 273 N.W.2d 829 (1979).

*Cherryland I*, 295 Mich. App. at 127 (internal quotation marks omitted).

The Michigan Court of Appeals affirmed the trial court's finding that defendants were personally liable for the loan deficiency; defendants appealed to the Supreme Court of Michigan. While the appeal was pending, the NMLA was enacted; in light of the NMLA, the Supreme Court remanded the case to the Court of Appeals.

## 2.    The Nonrecourse Mortgage Loan Act

In February 2012, the NMLA was introduced to the Michigan Legislature as Bill 992. It was passed by the Michigan Senate and Michigan House of Representatives in March 2012; on March 29, 2012 – while *Cherryland I* was pending before the Supreme Court of Michigan – the Governor of Michigan signed the NMLA into law.

Under the historical and statutory notes of the NMLA, "Enacting section 1" provides the purpose and intent of the Act:

> The legislature recognizes that it is inherent in a nonrecourse loan that the lender takes the risk of a borrower's insolvency, inability to pay, or lack of adequate capital after the loan is made and that the parties do not intend that the borrower is personally liable for payment of a nonrecourse loan if the borrower is insolvent, unable to pay, or lacks adequate capital after the loan is made. The legislature recognizes that the use of a post closing solvency covenant as a nonrecourse carveout, or an interpretation of any provision in a loan document that results in a determination that a post closing solvency covenant is a nonrecourse carveout, is inconsistent with this act and the nature of a nonrecourse loan; is an unfair and deceptive business practice and against public policy; and should not be enforced....

Historical and Statutory Notes, MCL 445.1591; P.A. 2012, No. 67, enacting § 1.

The NMLA is comprised of five sections, MCL 445.1591-95. The prohibited activity is laid out in Section 3 of the NMLA and provides that:

> (1) A post closing solvency covenant shall not be used, directly or indirectly, as a nonrecourse carveout or as the basis for any claim or action against a borrower or and any guarantor ... on a nonrecourse loan.

11

(2) A provision in the documents for a nonrecourse loan that does not comply with subsection (1) is invalid and unenforceable.

MCL 445.1593.  Section 2 of the NMLA defines the terms ""Nonrecourse carveout,"

"Nonrecourse loan," "Nonrecourse provisions," and "Post closing solvency covenant":

(a) "Nonrecourse carveout" means a specific exception, if any, to the nonrecourse provisions set forth in the loan documents for a nonrecourse loan that has the effect of creating, if specified events occur, personal liability of the borrower or a guarantor....

(b) "Nonrecourse loan" means a commercial loan secured by a mortgage on real property located in this state and evidenced by loan documents that meet any of the following:

(*i*) Provide that the lender will not enforce the liability or obligation of the borrower by an action or proceeding in which a money judgment is sought against the borrower.

(*ii*) Provide that any judgment in any action or proceeding on the loan is enforceable against the borrower only to the extent of the borrower's interest in the mortgaged property and other collateral security given for the loan.

(*iii*) Provide that the lender will not seek a deficiency judgment against the borrower.

(*iv*) Provide that there is no recourse against the borrower personally for the loan.

(*v*) Include any combination of subparagraphs (*i*) to (*iv*) or any other provisions to the effect that the loan is without personal liability to the borrower beyond the borrower's interest in the mortgaged property and other collateral security given for the loan.

(c) "Nonrecourse provisions" means 1 or more of the provisions described in subdivision (b)(*i*) to (*v*), whether or not the loan is subject to a nonrecourse carveout or carveouts.

(d) "Post closing solvency covenant" means any provision of the loan documents for a nonrecourse loan, whether expressed as a covenant, representation, warranty, or default, that relates solely to the solvency of the borrower, including, without limitation, a provision requiring that the

12

borrower maintain adequate capital or have the ability to pay its debts...The term does not include a covenant not to file a voluntary bankruptcy proceeding or other voluntary insolvency proceeding....

MCL 445.1592.

The NMLA applies only to "nonrecourse loan documents in existence on, or entered into on or after, [March 29, 2012]."  MCL 445.1595.

### 3.    The *Cherryland II* Decision

On September 26, 2012, the Supreme Court of Michigan remanded *Cherryland I* to the Court of Appeals to "reconsider its decision in light of the Legislature's recent passage of the NMLA...."  *Wells Fargo Bank, N.A. v. Cherryland Mall Ltd. P'ship*, 493 Mich. 859 (2012).

On remand, plaintiff argued that the NMLA did not invalidate the guaranty and that guarantor was still liable for the deficiency.  Noting that a "'post closing solvency covenant shall not be used, *directly or indirectly*, as a nonrecourse carveout or as the basis for any claim or action against ... any guarantor' and that any provision in the documents for a nonrecourse loan that purports to use a nonrecourse carveout as the basis for a claim against a guarantor 'is invalid and unenforceable,'" the Michigan Court of Appeals held that the provisions of the loan documents plaintiff relied on were "invalid and unenforceable under the NMLA"; and, "the NMLA ... bars plaintiff's claims." *Cherryland II*, 300 Mich. App. at 366, 370-71 (emphasis in original) (quoting MCL 445.1593(1) and (2)).

Plaintiff also argued that the NMLA was unconstitutional; specifically, it said the NMLA violated the Contract Clauses, due process protections and separation of powers provisions of the United States and Michigan Constitutions.  *Id.* at 370.  After thoroughly

13

addressing each of plaintiff's constitutional challenges, the Michigan Court of Appeals rejected plaintiff's arguments and found the NMLA constitutional.  *See id.* at 371-85.

### E.    The Motions

Plaintiff says that under the plain terms of the Loan Documents, Defendants are liable for the deficiency between the outstanding due on the Loan and the amount recovered at foreclosure.  Plaintiff says the NMLA does not bar its claims against Defendants for three reasons.

First, Plaintiff says the NMLA does not apply because the Loan was not a nonrecourse loan in existence on March 29, 2012, as defined by the Act.  Plaintiff says the Loan is not a nonrecourse loan because: (1) the nonrecourse provisions became null and void under Article 11(c) of the Note when Borrower became insolvent and failed to pay its debts and liabilities – which occurred in 2011; and (2) the December 2011 foreclosure sale extinguished the Mortgage on the Property.

Next, Plaintiff says the NMLA does not apply because the SPE covenant it relies upon – i.e., Borrower agrees it "shall not ... become insolvent or fail to pay its debts and liabilities from its assets as the same shall become due," *see* Mortgage, § 4.2(j) – is not a post closing solvency covenant.  Specifically, Plaintiff argues that Section 4.2(j) is not a post closing solvency covenant because it does not relate solely to Borrower's solvency; rather, Plaintiff says, Borrower's personal liability was triggered by its failure to pay its debts, "regardless of whether such failure is due to its insolvency."

Third, Plaintiff argues that even if the Loan is a nonrecourse loan and Section 4.2(j) is a post closing solvency covenant, the NMLA cannot bar its claims because the

14

Act is unconstitutional; specifically, Plaintiff says the NMLA violates the: Contract Clauses, Due Process Clauses, and separation of powers provisions of the United States Constitution and Michigan Constitution.

Defendants say the NMLA bars Plaintiff's claims as a matter of law. Specifically, Defendants say the Loan is a "nonrecourse loan" within the meaning of the NMLA, because Article 11(a) of the Note contains all of the "nonrecourse provisions" contemplated by the NMLA. Additionally, Defendants say Sections 4.2(j) and (s)[1] of the Mortgage – the SPE covenants pled in the complaint – are "post closing solvency covenants." Accordingly, Defendants say, the post closing solvency covenants are invalid and unenforceable under the NMLA and Plaintiff's claims must be dismissed as a matter of law. *See* MCL 445.1593.

Defendants also argue that without the NMLA, Plaintiff's claims fail as a matter of contract interpretation. Defendants say the action should be dismissed as a matter of law, because the Loan is a nonrecourse loan and Borrower did not violate any of the SPE covenants; they say that "[b]ecause the Borrower no longer had any assets, [it] never failed to pay its debts from its assets, it never breached Section 4.2 of the Mortgage, and the limited recourse provisions were never triggered."

Alternatively, Defendants say Plaintiff's interpretation of the Loan Documents – that the Loan became fully recourse because Borrower failed to make Loan payments – is illogical and violates fundamental principles of contract interpretation. They argue

---

[1]Although Plaintiff alleges in the complaint that Borrower is personally liable under Sections 4.2(j) and (s) of the Mortgage, it does not advance any argument or respond to any of Defendants' arguments regarding Section 4.2(s); in its motion, Plaintiff relies solely on Section 4.2(j) to pursue recourse liability against Borrower.

that Plaintiff's interpretation would render the nonrecourse provisions of the Loan
meaningless; Defendants say that such a reading is contrary to the intent of the parties
and violates the principle of contract construction requiring that a contract be construed
as a whole, with effect given to all provisions.

### III.    STANDARD OF REVIEW

The Court will grant summary judgment "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
250-57 (1986).  "[T]he filing of cross-motions for summary judgment does not
necessarily mean that an award of summary judgment is appropriate."  *Spectrum Health
Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th
Cir. 2005).  "The standard of review for cross-motions for summary judgment does not
differ from the standard applied when a motion is filed by only one party to the litigation."
 *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011).

When reviewing cross-motions for summary judgment, the court must assess
each motion on its own merits.  *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins.
Co.*, 415 F.3d 487, 493 (6th Cir. 2005).  The facts must be viewed in the light most
favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.*, 475 U.S. 574, 587 (1986).

A fact is material for purposes of summary judgment if proof of that fact would
have the effect of establishing or refuting an essential element of the cause of action or
a defense advanced by the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

16

1984).

## IV.    DISCUSSION

### A.    Choice of Law

The Court applies the substantive law of Michigan in this diversity action.  *See Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) ("Because we are sitting in diversity, *see* 28 U.S.C. § 1332, we apply the law, including the choice of law rules of the forum state.") (citation and footnote omitted).  Additionally, "Michigan's public policy favors the enforcement of contractual forum-selection clauses and choice-of-law provisions." *Turcheck v. Amerifund Fin., Inc.*, 272 Mich. App. 341, 345 (2006) (citation omitted).  The parties agreed that Michigan law will govern interpretation and enforcement of the Loan Documents; the Note, Mortgage, and Guaranty all provide that they must be "governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located."  (*See* Note, Art. 13; Mortgage, § 17.1; Guaranty ¶ 19).

### B.    Applicability and Effect of the NMLA to the Loan Documents

Both Plaintiff and Defendants request summary judgment on the applicability and effect of the NMLA to the Loan Documents.

#### 1. The Loan is a Nonrecourse Loan

Plaintiff argues that the NMLA does not apply to the Loan because the Loan is not a nonrecourse loan within the meaning of the Act.  Plaintiff notes that, although retroactive, the NMLA only applies to nonrecourse loans "in existence on, or entered into on or after, [March 29, 2012]." *See* MCL 445.1595.  Plaintiff also points out that to

be a nonrecourse loan, the loan documents must contain a "nonrecourse provision" and be "secured by a mortgage on real property."  *See* MCL 445.1592(b) and (c).  Based on those requirements, Plaintiff argues, the NMLA does not apply because the Loan was not a "nonrecourse loan" – as defined by Sections 2(b) and (c) of the Act – as of March 29, 2012.

Specifically, Plaintiff contends that under Article 11(c) of the Note, recourse liability triggered "when the Borrower became insolvent or failed to pay its debts as they became due—an event that must have occurred long before March 29, 2012."  Thus, Plaintiff says that because "any nonrecourse provisions became 'null and void and of no further force and effect'" before the effective date of the NMLA, the Loan became fully recourse, such that it was not a nonrecourse loan "in existence on, or entered into on or after, [March 29, 2012]."  Plaintiff also says the Loan was not a nonrecourse loan in existence on March 29, 2012, because the December 2011 foreclosure sale extinguished the Mortgage on the Property.  *See* MCL 445.1592(b).

Defendants say there can be no dispute that the Loan is a "nonrecourse loan" within the meaning of the NMLA, because Article 11(a) of the Note contains all of the "nonrecourse provisions" contemplated by the NMLA.  *See* MCL 445.1592(b) and (c). Defendants also say that this case is factually similar to *Cherryland*; and, the Michigan Court of Appeals' decision in *Cherryland II* is a persuasive indication of how the highest state court would find on this issue, which would be binding on the Court.

In response to Plaintiff's argument regarding the Mortgage being extinguished, Defendants say that nothing in the NMLA requires that a nonrecourse loan be secured by an existing mortgage.  Defendants also note that all of the nonrecourse carve-out

18

provisions Plaintiff relies on are in the Mortgage; thus, if the Mortgage is extinguished, Plaintiff's claims would be extinguished.

When applying substantive law of a state in a diversity action, the Court is bound by decisions of the state's highest court. *Kingsley Ass'n, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995) (citations omitted).  Because there is no binding precedent from the Supreme Court of Michigan, the Court must make the best prediction of how that court would resolve the issue based on all relevant data, including decisions of the Michigan Court of Appeals; those decisions should not be disregarded unless there is "persuasive data that the Michigan Supreme Court would decide otherwise." *Id.* (citations omitted).  Plaintiff's argument that the Loan ceased being a nonrecourse loan before March 2012, such that the NMLA is inapplicable, requires a close review of the statutory definition of a "nonrecourse loan."

The NMLA provides that a nonrecourse loan is a commercial loan, secured by a mortgage on real property, that contains one or more nonrecourse provisions.  The Act does not provide whether a nonrecourse loan requires only that the loan documents contain a nonrecourse provision or whether the nonrecourse provisions must also be legally effective  – and not null and void as Plaintiff contends; similarly, the Act does not explain whether a nonrecourse loan maintains that designation once the mortgage securing it is extinguished.  Because the definition of nonrecourse loan is unclear as to whether a loan maintains its nonrecourse loan designation – as defined by the Act – in these circumstances, the Court must consider the Legislature's intent.  *See Amerisure Ins. Co. v. Auto-Owners Ins. Co.*, 262 Mich. App. at 10, 14) (citation omitted).  Most importantly, the Court must give effect to the Legislature's intent when construing a

19

statute.  *See Tryc v. Mich. Veterans' Facility*, 451 Mich. 129, 135 (1996) (citation omitted); *Amerisure*, 262 Mich. App. at 14-15).

Although the Mortgage was extinguished and Article 11(c) of the Note rendered Lender's agreement not to pursue recourse liability null and void and of no further force and effect, the Court finds that the Michigan Legislature intended for the Loan to still be considered a nonrecourse loan under the NMLA.  It is undisputed that the Loan, when entered, was a CMBS, nonrecourse loan; as executed, the Loan contained certain recourse provisions which were ***exceptions*** to its nonrecourse nature.  The occurrence of an event triggering one of those exceptions does not change the overarching nonrecourse designation of the Loan; rather, although the Loan may provide for recourse liability in a practical sense, it will always maintain its original nonrecourse designation.  In other words, the Loan is a nonrecourse loan under which Lender can pursue a deficiency judgment to the extent allowed by the Act.

Reading the NMLA as Plaintiff suggests – i.e., that the Act does not apply because the Mortgage was extinguished and the nonrecourse provisions were rendered void due to Borrower's insolvency/failure to pay – would directly contradict the Michigan Legislature's intention to prohibit a lender from pursuing recourse liability under loan documents that include nonrecourse provisions, such as the Loan.  Moreover, finding that the Loan is not a nonrecourse loan because the Mortgage was extinguished would allow lenders to pursue recourse liability after foreclosing on the mortgage since the loan would no longer be secured by a mortgage.

Although not binding, the Michigan Court of Appeals' decision in *Cherryland II* supports the Court's interpretation of the NMLA.  *See Kingsley*, 65 F.3d at 507

("decisions [of the Michigan Court of Appeals] should not be disregarded unless [the Court] is presented with persuasive data that the Michigan Supreme Court would decide otherwise") (citation omitted).  In *Cherryland II*, the court reversed its pre-NMLA decision and found that the Act barred plaintiff's claims.  300 Mich. App. at 366.  Similar to here, the plaintiff in *Cherryland* foreclosed on the mortgage before the NMLA was enacted; additionally, the nonrecourse provisions and SPE covenants were similar to those in the Loan Documents.  *Id.* at 367; *Cherryland I*, 295 Mich. App. at 112-13.

"Furthermore, '[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, [the Court] should choose the narrower and more reasonable path.'"  *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (citation omitted).

The Court finds that the Loan is a nonrecourse loan as contemplated by the NMLA, because: (1) the Michigan Legislature intended the Loan to be included within the statutory definition of nonrecourse loan, *see Tryc*, 451 Mich. at 135; (2) Plaintiff has not provided persuasive data that the Michigan Supreme Court would decide this issue differently than the Michigan Court of Appeals did in *Cherryland II*, *see Kingsley*, 65 F.3d at 507; and (3) such a finding is "the narrower and more reasonable path" and interprets state law to "reasonably restrict[] liability" rather than "greatly expand[] liability," *see Combs*, 354 F.3d at 577.

### 2. The SPE Covenants are Post Closing Solvency Covenants

Plaintiff says the NMLA is inapplicable because Section 4.2(j) of the Mortgage is not a post closing solvency covenant; specifically, Plaintiff says Section 4.2(j) does not "relate solely to the solvency" of Borrower.  *See* MCL 445.1592(d).  Rather, Plaintiff

21

says, Borrower's personal liability is triggered by its failure to pay its debts and liabilities, "regardless of whether such failure is due to its insolvency."

Relying on the language of MCL 445.1592(d), Defendants say Sections 4.2(j) and (s) of the Mortgage clearly are "post closing solvency covenants" within the meaning of the Act. Additionally, Defendants say the Michigan Court of Appeals in *Cherryland II* "held that substantially similar CMBS loan covenants ... were covered by the Act." Thus, Defendants say, Sections 4.2(j) and (s) are "invalid and unenforceable" under the NMLA, *see* MCL 445.1593, and Plaintiff's claims must be dismissed.

The Court agrees with Defendants; the SPE covenants Plaintiff relies on to trigger Borrower's personal liability are post closing solvency covenants.

While Plaintiff highlights the portion of the definition providing that a post closing solvency covenant is a provision that relates "solely" to the solvency of the borrower, a reading of the definition as a whole shows that it is inclusive – not exclusive, as Plaintiff suggests. *See* MCL 445.1592(d) ("'Post closing solvency covenant' means any provision of the loan documents for a nonrecourse loan ... that relates solely to the solvency of the borrower, ***including***, ***without limitation***, a provision requiring that the borrower maintain adequate capital or have the ability to pay its debts...The term does not include a covenant not to file a voluntary bankruptcy proceeding or other voluntary insolvency proceeding....") (emphasis added). It is clear that Section 4.2(s) of the Mortgage – which provides that Borrower "shall not fail to maintain adequate capital..." – is a post closing solvency covenant; the Act explicitly contemplates this type of provision in the definition.

Section 4.2(j) also is a post closing solvency covenant. The NMLA's definition of

a post closing solvency covenant "includes, *without limitation*," provisions requiring that a borrower be able to pay its debts; after explaining the types of provisions included, the definition explicitly excludes certain provisions from the meaning of the term – e.g., covenants not to voluntarily file for bankruptcy.  Notably, Plaintiff's "failure to pay" provision is not excluded from the meaning.

Plaintiff's interpretation of the post closing solvency covenant definition not to include Section 4.2(j) is contrary to the intent of the Michigan Legislature and contrary to the Michigan Court of Appeals' decision in *Cherryland II*, the only persuasive authority interpreting and applying the Act.  In *Cherryland II*, the court held that a SPE covenant legally indistinguishable from Section 4.2(j) was within the NMLA's meaning of a post closing solvency covenant.  *See Cherryland*, 300 Mich. App. at 366-68.  Plaintiff fails to provide any evidence that the Supreme Court of Michigan would decide the issue differently than the Michigan Court of Appeals in *Cherryland II*; accordingly, that decision provides substantial support for the conclusion that Sections 4.2(j) is a post closing solvency covenant.  *See Kingsley*, 65 F.3d at 507 ("decisions [of the Michigan Court of Appeals] should not be disregarded unless [the Court] is presented with persuasive data that the Michigan Supreme Court would decide otherwise").  Furthermore, the conclusion that Section 4.2(j) is within the statutory definition of post closing solvency covenant is supported by the fact that it "reasonably restricts liability ... [rather than] greatly expands liability."  *See Combs*, 354 F.3d at 577.  Section 4.2(j) of the Mortgage is a post closing solvency covenant within the meaning of the Act.

Because the Loan is a nonrecouse loan and Sections 4.2(j) and (s) of the Mortgage are post closing solvency covenants, the NMLA applies to the Loan

23

Documents; the post closing solvency covenants Plaintiff relies on are invalid and unenforceable under the Act. *See* MCL 445.1593. Accordingly, unless the NMLA is unconstitutional as applied to the Loan Documents – as Plaintiff contends – Sections 4.2(j) and (s) cannot be used to pursue a deficiency judgment against Defendants; the Court must determine whether the NMLA is constitutional.

### C.   Constitutionality of the NMLA as Applied to the Loan Documents

Plaintiff says that even if the Loan is a nonrecourse loan and the SPE covenants at issue are post closing solvency covenants, the NMLA cannot bar its claims because it is unconstitutional. Specifically, Plaintiff says the NMLA violates: (1) the Contract Clauses of the United States and Michigan Constitutions; (2) the Due Process Clauses of the United States and Michigan Constitutions; and (3) the federal and state separation of powers provisions.

### 1. Contract Clauses

Article I, Section 10, clause 1 of the United States Constitution provides that "No State shall ... pass any ... Law impairing the Obligation of Contracts; the Michigan Constitution similarly provides that "No ... law impairing the obligation of contract shall be enacted, Mich. Const. 1963, art. 1, §10.

The Michigan Contract Clause is interpreted under the same standards and using the same analysis as the federal Contract Clause (together, the "Contract Clause"). *See Blue Cross & Blue Shield of Mich. v. Milliken*, 422 Mich. 1, 22-23 (1985) ("The federal balancing approach has been adopted by our Court for purposes of adjudicating state Contract Clause claims as well as federal Contract Clause claims."); *Cherryland II*, 300 Mich. App. at 371 ("The 'state constitutional provision is not

24

interpreted more expansively than its federal counterpart.'") (citation omitted).

In *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400 (1983), the United States Supreme Court established a three-part test for analyzing claims under the Contract Clause: (1) "The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship"; (2) "If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, ... such as the remedying of a broad and general social or economic problem"; and (3) "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption."  *Energy Reserves*, 459 U.S. at 411-12 (citations and internal quotation marks and brackets omitted).

In arguing that the NMLA is unconstitutional, Plaintiff first says that the three-part test in *Energy Reserves* does not apply to debtor-relief laws such as the Act, because the Supreme Court has never applied it in the context of a law that discharges a debtor of its obligation to repay a debt.  Rather, Plaintiff relies on several early United States Supreme Court cases which held that states could not enact laws discharging debtors' contractual obligation to repay their debts, *see Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 199-201, 4 L.Ed 529 (1819); *Walker v. Whitehead*, 83 U.S. (16 Wall.) 314, 318, 21 L.Ed. 357 (1873).  Plaintiff says "the NMLA would run directly afoul of an unbroken line of Supreme Court decisions dating back to 1819" – i.e., *Sturges* and *Walker* – because "[t]he NMLA is the precise type of 'evil' the Contract Clause was

25

designed to prohibit."

However, the modern Supreme Court has moved away from such a strict, literal reading of the Contract Clause and construed it as allowing a state to use its police power to repudiate contractual obligations where reasonably related to protect an important public interest. *See*, *e.g.*, *Energy Reserves*, 459 U.S. at 410 ("Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934))); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) ("[A] statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment." (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241-42 (1978))). Indeed, the Supreme Court found that even in cases involving "legislation that was designed to repudiate or adjust pre-existing debtor-creditor relationships" – which was the Contract Clause's "primary focus" – "the Court has refused to give the Clause a literal reading." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502-03 (1987). Thus, the three-part test is the appropriate standard to use to analyze the Act.

Under the first prong, if the Court "determine[s] that there has been an impairment, [it] must then determine whether the impairment is 'substantial' ... [I]f that question is answered in the affirmative, [the Court] must go on to determine 'whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in the service of a legitimate and important public purpose.'" *United States v. County of Muskegon*, 298 F.3d 569, 584 (6th Cir. 2002) (citations omitted).

26

Plaintiff says the NMLA substantially impairs its contractual relationship with Defendants because the Act "nullifies an express contractual term and completely undermines the relief contemplated in the Guaranty," which is the "precise contract provision the Framers intended to protect through the Contract Clause–i.e., a promise to repay a debt."  In addition, Plaintiff says the NMLA operates as a substantial impairment because it "purports to 'invade[] an area never before subject to regulation by the State." *See Cloverdale Equip. Co. v. Manitowoc Eng'g Co.*, 964 F. Supp. 1152, 1163 (E.D. Mich. 1997) ("A critical factor to be considered in determining the extent of the impairment is whether the complaining party has been regulated in the past." (citing *Allied Structural,* 438 U.S. at 244)).

Defendants say Plaintiff fails to satisfy the first prong of the test because there is no evidence that it relied on the SPE covenants at issue or was induced by the possibility that the Loan provided for recourse liability against Defendants in deciding to purchase the Property at auction; similarly, Defendants say there is no evidence that Lender relied on, or was induced by, the SPE covenants when providing the Loan. Thus, Defendants argue, because neither Lender nor Plaintiff had any contractual expectations that the Loan was recourse due to Borrower's insolvency/failure to pay its debts, the NMLA did not impair any contractual relationship; or, at most, there was only a minor impairment.

Although the Court disagrees with Defendants that there was no impairment, it agrees that Plaintiff fails to satisfy the first prong of the *Energy Reserves* standard; the contractual impairment does not rise to the level of "substantial."

In determining whether an impairment is substantial, the main focus is on the

27

parties' expectations.  *See Energy Reserves*, 459 U.S. at 411 ("[S]tate regulation that

restricts a party to gains it ***reasonably expected*** from the contract does not necessarily

constitute a substantial impairment.") (emphasis added).  The Sixth Circuit has found

that a party "flunks" the substantial impairment test if it fails to show that the contractual

expectation impaired actually induced the parties:

> The Supreme Court has provided little specific guidance on how we are to
> gauge the substantiality of an impairment, but *Baltimore Teachers Union
> v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1017 (4th Cir.1993),
> suggests that the Court "has appeared to assume that an impairment is
> substantial at least where the ***right abridged was one that induced the
> parties to contract in the first place*** ...." (Citations omitted.) If this is the
> test, S.D. Warren flunks it. The record in the case at bar is a voluminous
> one, but we have searched it in vain for any concrete evidence that the
> company would have rejected a contract that incorporated regulations of
> the sort enacted by the county in its ordinances of 1994 and 1998. One
> can speculate that such an ordinance would have been a deal breaker,
> but speculation cannot suffice; we need proof, and S.D. Warren has
> pointed to none.

*County of Muskegon*, 298 F.3d at 585 (emphasis added).

Plaintiff fails to provide any evidence that it relied on, or was induced by, Section

4.2(j) or (s) when purchasing the Property at auction; likewise, Plaintiff fails to show

Lender relied on, or was induced by, either of those SPE covenants in providing the

Loan.  Plaintiff attempts to do so by summarily stating that the SPE covenants at issue

induced Lender to provide the Loan, because they were part of the agreement;

however, "speculation cannot suffice; [the Court] need[s] proof."  *Id.*

All of the concrete evidence supports the finding that neither Lender nor Plaintiff

was induced by, or relied on, the SPE covenants on which Plaintiff bases its action.

The Loan was a nonrecourse loan; it is undisputed that CMBS nonrecourse loans never

intended to create personal liability based on a borrower's insolvency or failure to pay. Plaintiff's own counsel staunchly advanced this exact argument in a recent case before this Court. *See 5147 Bay Road Holdings, LLC v. Landmark Plaza Assoc. Ltd. P'ship*, Case No. 11-12347, Answer and Counterclaim, Doc. # 21, pp. 14-16, ¶¶ 22 and 25 (E.D. Mich., Aug. 4, 2011) (Ludington, J.) ("Lender's Complaint asserted the circular argument that because Borrower defaulted on the Loan, Borrower breached its covenants against 'becoming insolvent or failing to pay its debts from its assets as they become due.' ... This argument is circular in that it says in effect by merely defaulting on this Loan, the Borrower became insolvent, and therefore personal liability has sprung up from the default alone. Lender's argument also renders as nullity the several pages of language addressing the non-recourse character of the Loan....The personal liability Lender claims would arise in every case in which the value and income of the collateral fell below the Loan amount. Lender contends absurdly that the loan is non-recourse unless there is a default, and then it is recourse. In that case, every non-recourse Loan would become recourse.").

Moreover, the conduct of Lender and Plaintiff clearly illustrates that they did not reasonably expect to be able to pursue recourse liability in this situation. After foreclosing on the Mortgage, Lender did not pursue a deficiency judgment against Defendants; instead, it sold the property at an online auction website for $756,000 – more than $5 million less than it could have sought from Defendants *if* the Loan allowed it to pursue the deficiency. Notably, in the marketing materials for the auction sale, Lender listed the Loan as "Non-Recourse." There is no evidence that Plaintiff thought it was acquiring the rights to pursue a deficiency judgment against Defendants in addition

to the Property.   The evidence establishes that Plaintiff did not review the Loan Documents before purchasing the Property at auction; rather, Plaintiff purchased the Property because the price of $756,000 was well below the Property's appraised value of $4.6 million and its principals thought they were acquiring the Property for a good price.  Thus, like Lender, Plaintiff was not induced by, and did not rely on, the SPE provisions which it now claims rendered the Loan recourse; Plaintiff had no contractual expectation of pursuing a deficiency judgment, because it admittedly did not read the Loan Documents and the Loan was marketed as "Non-Recourse."

Because there is no evidence in the record that Plaintiff – or Lender – relied whatsoever on the SPE covenants at issue (for the notion that the Loan became recourse upon Borrower's insolvency or failure to pay), Plaintiff cannot show that the NMLA substantially impaired its contractual expectations.  *See Energy Reserves*, 459 U.S. at 411-12; *County of Muskegon*, 298 F.3d at 584-85.  Moreover, notwithstanding the fact that the NMLA did not substantially impair Plaintiff's contractual expectations or the fact that the Court need not address the second and third prongs of the three-part test, *see id.*, the Legislature properly exercised its police power under each of those prongs.  *See Cherryland II*, 300 Mich. App. at 375-79 (finding that the Michigan Legislature had a significant and legitimate public purpose in passing the Act – i.e., to "avert a broad[] economic problem of immense proportion in the interest of the public good – and that no lesser measure could have accomplished the legislative purpose).

The NMLA does not violate the Contract Clause.

### 2. Substantive Due Process

The Fourteenth Amendment to the United States Constitution states that no

"State [shall] deprive any person of life, liberty, or property, without due process of law...."  The Michigan Constitution similarly provides that "No person shall be ... deprived of life, liberty or property, without due process of law."  Mich. Const. 1963, art. 1, §17.

Because "[r]etroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, [and] because it can deprive citizens of legitimate expectations and upset settled transactions[,] ... 'retroactive aspects of economic legislation ... must meet the test of due process': a legitimate legislative purpose furthered by rational means."  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (internal brackets in original omitted) (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984)).  Similarly, in deciding whether a plaintiff's due process rights have been violated under Michigan law, the Court must determine "whether the legislation bears a reasonable relation to a permissible legislative objective."  *Phillips v. Mirac, Inc.*, 470 Mich. 415, 436 (2004) (citation omitted).

"It is ... well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality.  *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).  Plaintiff, as the one alleging a due process violation, has the burden of rebutting the presumption that the Michigan Legislature had a rational basis for enacting the NMLA.  *See id.* ("[T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.").  The Sixth Circuit recently elaborated on this standard:

As the Supreme Court often has reiterated, the party challenging a

legislative enactment subject to rational basis review must negative every conceivable basis which might support it.  Under rational basis review, it is constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.  [W]e will be satisfied with the government's rational speculation linking the regulation to a legitimate purpose, even unsupported by evidence or empirical data.  Thus, if a statute can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny.

*Am. Express Travel Related Servs. Co., Inc. v. Kentucky*, 641 F.3d 685, 690 (6th Cir.

2011) (internal citations and quotation marks omitted).

Plaintiff summarily states that "the NMLA's provisions are the epitome of an arbitrary exercise of power by the government, constituting nothing more than a 'naked attempt to raise a fortress protecting' sophisticated commercial real estate developers from having to pay their contractual debts."

In *Cherryland I*, although the Michigan Court of Appeals "recognize[d] that [its] interpretation seem[ed] incongruent with the perceived nature of a nonrecourse debt and [was] cognizant of the amici curiae's arguments and calculations that, if accurate, indicate[d] economic disaster for the business community in Michigan if [it] uph[eld] the trial court's interpretation," it rejected defendants public policy arguments, because "'making social policy is a job for the Legislature, not the courts,'" and "'the Legislature possesses superior tools and means for gathering facts, data, and opinion and assessing the will of the public....'"  *Cherryland I*, 295 Mich. App. at 126-27 (quoting *Woodman v. Kera LLC*, 486 Mich. 228, 245-46 (2010) (citation omitted)).  After that decision, the Michigan Legislature did its job; it decided a public policy issue by enacting the NMLA.

In deciding to pass the NMLA, the Legislature was presented with substantial

evidence that CMBS financing in Michigan – a multi-billion dollar industry – would collapse, which would be catastrophic to future development in the state.  *See*, *e.g.*, *Cherryland II*, 300 Mich. App. at 382 ("[T]here were concerns that existing CMBS loans with postclosing solvency covenants would result in commercial developers not qualifying for financing to pursue continued economic development in Michigan, that tax revenues would be affected, and that foreclosures would increase, all during a period of economic recovery in this state.").  Notably, there was no testimony against the Act. The concerns facing the Michigan public were real and significant.  The means chosen to address these concerns – declaring that one form of SPE covenant, which never was intended to trigger recourse liability, was invalid and unenforceable – were not arbitrary or irrational.  *See id.* (finding the same).

The NMLA does not violate Plaintiff's due process rights.

### 3. Separation of Powers

 "The functions of government under our system are apportioned....[T]he legislative department has ... the duty of making laws; ... the executive [has] the duty of executing them; and ... the judiciary [has] the duty of interpreting and applying them in cases properly brought before the courts.  The general rule is that neither department may invade the province of the other and neither may control, direct or restrain the action of the other."  *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923); *Kyser v. Kasson Twp.*, 486 Mich. 514, 535 (2010); *see also* Const. 1963, art. 3, § 2.

Plaintiff argues that the NMLA violates the federal and state separation of powers provisions because it is a "special bill" that usurps the Court's exclusive power to

interpret and enforce the parties' contracts; Plaintiff says the Legislature, through the

retroactive application of the Act, provided legal meaning to private contracts and, "as

such ... dictated the substance of the Court's decree."

In dismissing identical arguments by the plaintiff in *Cherryland II*, the Michigan

Court of Appeals found that:

> [T]he legislation does not "interpret" the contract or direct this Court or any
> court to do anything. It declares that the postclosing solvency covenant is
> invalid, unenforceable, and against public policy. This may have the effect
> of invalidating plaintiff's entitlements based on the contract, but if so it will
> be because the courts apply the new law, not because the Legislature has
> directly dictated the outcome in this case.

*Cherryland II*, 300 Mich. App. at 385.  For the same reasons, Plaintiff's arguments fail.

As Plaintiff admits, the Michigan Legislature passed the NMLA "without even reviewing

the contracts at issue" – i.e., the Loan Documents; thus, the Legislature did not direct

the Court to decide the case a particular way based on the Loan Documents.  The Court

retains its exclusive power to interpret and enforce the Loan Documents; it just does so

in light of the NMLA.

Moreover, as the Michigan Attorney General notes, it is the role of the Legislature

to declare the state's public policy.  *See Cherryland I*, 295 Mich. App. at 126-27

("'making social policy is a job for the Legislature, not the courts'" (quoting *Woodman v.

Kera LLC*, 486 Mich. 228, 245-46 (2010) (citation omitted))).  That is exactly what the

Legislature did here; it established Michigan's public policy regarding insolvency

covenants in CMBS financing – a policy in line with the longstanding status quo in

CMBS financing that post closing solvency covenants do not render a nonrecourse loan

recourse.

34

The NMLA does not violate separation of powers principles.

## V.    CONCLUSION

Defendants' Motion to Dismiss and/or For Summary Judgment (Doc. # 29) is

**GRANTED**; Plaintiff's Motion for Summary Judgment (Doc. # 35) is **DENIED**.  Plaintiff's

claims are **DISMISSED**.

No genuine issue of material fact exists; Defendants are entitled to judgment as a

matter of law.  The Loan is a nonrecourse loan and the SPE provisions Plaintiff relies on

are post closing solvency covenants within the meaning of the Nonrecourse Mortgage

Loan Act; the NMLA applies to the Loan Documents and bars Plaintiff's claims.  The

NMLA does not violate the Constitution of the United States or Michigan.

**IT IS ORDERED**.


S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge


Dated:  March 11, 2014

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
March 11, 2014.

S/Carol A. Pinegar
Deputy Clerk